UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF
MARYLAND
(Northern Division)

| | | |
|---|---|---|
| DISABILITY RIGHTS MARYLAND, INC., | * | |
| Plaintiff, | * | |
| v. | | Case No. 1:25-cv-00070-JRR |
| | * | |
| DR. LAURA HERRERA SCOTT, *et al.*, | * | |
| Defendants. | | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**INTRODUCTION**

The Plaintiff, Disability Rights Maryland (DRM), brings this suit on behalf of unnamed individuals who have been found incompetent to stand trial (IST) and committed to the Maryland Department of Health (MDH or Department) by a trial court and were not admitted to a Department facility for treatment within 10 business days as required by Md. Code Ann., Crim. Proc. § 3-106 (LexisNexis 2018).

Plaintiff brings this lawsuit under Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, 42 U.S. Code §1983, and Article 24 of the Maryland Declaration of Rights seeking injunctive and declaratory relief. Plaintiff alleges that the delay in admission results in the individuals not receiving proper mental health treatment in violation of these laws.

## BACKGROUND

### A.    The Statutory Scheme for Court Committed Defendants' Admission to the Maryland Department of Health Facilities

A criminal prosecution may not proceed against a defendant who is not competent to stand trial.  A person is "not competent to stand trial" if they are unable (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense.  Md. Code Annotated, Crim. Proc. § 3-101(f) (LexisNexis 2018).

To aid the court in determining is a defendant is incompetent to stand trial, a court may "order the [Department] to examine the defendant." § 3-105(a)**.**  Following that examination, the Department submits a report to the court offering an opinion as to competency and then, if that opinion is incompetent, a dangerousness opinion is also offered in a separate report.  § 3-105(d). Criminal Procedure  § 3-106(c) states, in pertinent part, that "[i]f . . . the court finds that the defendant is incompetent to stand trial and, because of mental retardation or a mental disorder, is a danger to self or the person or property of another, the court may order the defendant committed to the [Department]" and [i]f the court commits a defendant to the Health Department . . . the Health Department shall admit the defendant. . . not later than 10 business days after the Health Department receives the order of commitment . . . ." *Id.*

Many defendants are ordered to remain in Department facilities to maintain their competency.  However, in some cases a defendant never regains competency and is found incompetent and not likely to become competent in the foreseeable future ("restorability"). In those cases, the court must civilly commit the defendant to an inpatient facility designated by the Department if five statutory criteria for involuntary admission are met.  § 3-106(e).

Following a finding that a defendant is guilty, but not criminally responsible, the defendant is committed to the Department for institutional inpatient care or treatment. § 3-112(b), (d).

Pursuant to § 3-112(e), the Department shall "(1) admit the defendant to a designated health care facility as soon as possible, but not later than 10 business days after the Health Department receives the order of commitment; and (2) notify the court of the date on which the defendant was admitted to the designated health care facility."

Individuals remain committed under Crim. Proc. § 3-112 until (1) such a time that they can demonstrate that they are either eligible for discharge from commitment, or (2) that they would be eligible for conditional release from commitment because they would not be a danger, as a result of mental disorder or mental retardation, to self or to the person or property of others if released from confinement with conditions imposed by the court. § 3-114. If persons who are conditionally released from the court's commitment, pursuant to § 3-114, fail to adhere to the conditions of their release, they can return voluntarily to the hospital or be returned to the hospital pursuant to a warrant and petition for revocation. § 3-121.

### B.    Control of Patient Release

Patients may only be released from the hospital with the permission of the court. Under Crim. Proc. § 3-106, the court determines whether a defendant is competent to stand trial and a danger to themselves or others. If the court finds the defendant is incompetent but not dangerous, the court may set bail for the defendant or authorize release of the defendant on recognizance. § 3-106(b). Similarly, under §§ 3-114—118, the court determines whether a defendant found not criminally responsible may be discharged or released from a Department facility with conditions.

### C.    The Plaintiff's Claims

Plaintiff brings this suit alleging that there are more than 200 defendants who are in detention centers around the state awaiting placement to an MDH healthcare facility. (ECF No. 1, Compl. ⁋ 1, 25.) Plaintiff does not allege that these defendants are not admitted to MDH facilities,

but rather that they have to wait "weeks to months" for admission. (ECF No. 1, Compl. ¶ 1.) Plaintiff alleges that this delay is a violation of the civil rights of those defendants. (ECF No. 1, Compl. ¶ 20, 26, 64.)

Plaintiff acknowledges that it is the courts and not the Department that is empowered to determine whether an individual defendant is incompetent to stand trial. (ECF No. 1, Compl. ¶ 1.) They further acknowledge that it is the court who must make a finding of dangerousness in order for the defendant to be committed to MDH. (ECF No. 1, Compl. ¶ 10-11.) Plaintiff further alleges that the Department's evaluators have over diagnosed dangerousness, but again acknowledge that it is the courts who make that final determination. (ECF No. 1, Compl. ¶ 27.)

Finally, Plaintiff alleges that over 40% of people in this system are charged with misdemeanors and non-violent felonies and could be restored to competency in a community setting but again does not claim that the Department has any control over the decision about where a criminal defendant is placed. (ECF No. 1, Compl. ¶ 31.)

For the reasons outlined below, Plaintiff's Complaint does not state a claim under the ADA or the Rehabilitation Act and thus those counts must be dismissed by this Court.

## STANDARD OF REVIEW

The Defendants' motion to dismiss is brought pursuant to Federal Rules of Civil Procedure 12(b)(1), lack of subject matter jurisdiction, and 12(b)(6), failure to state a claim upon which relief can be granted. When a Rule 12 motion is based on more than one ground, the court should consider the 12(b)(1) challenge first because, if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot. *See Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006).

A motion to dismiss pursuant to Rule 12(b)(1) should be granted when a complaint "fails to allege facts upon which the court may base jurisdiction." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). The party asserting federal jurisdiction has the burden of proving that subject matter jurisdiction exists. *Richmond, Fredericksburg & Potomac R. Co., v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

To survive a motion to dismiss brought under Rule 12(b)(6), a complaint must allege sufficient facts, which, if proven, would entitle the plaintiff to relief under a cognizable legal claim. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). In reviewing a Rule 12(b)(6) motion to dismiss, the court considers only the well-pleaded factual allegations in the complaint. *Id.* And the court must "accept as true all of the factual allegations contained in the [pleading]," and consider only those allegations. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). A complaint should be dismissed, if the factual allegations are not enough to raise a right to relief above the speculative level. *Twombly,* 550 U.S. at 570. The factual allegations should be set apart from "mere conclusory statements," which are not considered as true." *Ashcrosft v. Iqbal,* 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

## ARGUMENT

### I.  THE PLAINTIFF LACKS STANDING.

To establish standing, Plaintiff must demonstrate (1) an injury in fact that is (2) "fairly traceable" to Defendants' conduct and (3) that can be redressed by the Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). "[I]t is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court." *Murthy v. Missouri,* 603 U.S. 43, 57 (2024) (quoting *Simon v. Eastern Ky. Welfare Rights*

*Organization,* 426 U.S. 26, 41-42 (1976)).   Plaintiff alleges that the Department has denied IST individuals "their ability to live in the community" based upon the Department's engaging in "the practice of imputing a presumption of dangerousness based solely upon a finding of mental illness, rather than as a result of an individualized mental health assessment."[1]  (ECF No. 1, Compl. ⁋ 61) But then the Plaintiff explains that the court, not the Department, makes the dangerous finding: "This practice has caused a gross over-designation of IST defendants as dangerous *by the courts,* which generally defer to the *recommendation* of MDH in classifying defendants."  (ECF No. 1, Compl. ⁋ 27.) (emphasis added).   Plaintiff's allegations do not establish that the Department has caused the injury they seek to redress.  The Department does not have the authority to commit an IST individual to a facility and preclude their placement in the community.  *See* Crim. Proc. § 3-106(c)(1)(i).

Further, Plaintiff cannot rely on the court's alleged deference to the Department's assessment of dangerousness to establish standing.  In *Murthy,* two States and five social-media users, sued dozens of U.S. Executive Branch officials and agencies, seeking injunctive relief, alleging that the government officials coerced social media companies, such as Facebook and Twitter, to suppress information the government officials deemed misleading concerning the COVID-19 pandemic.  603 U.S. at 48.   In holding that Plaintiffs lacked Article III standing to seek an injunction against any defendant, the Supreme Court found that the government denied the injunctive relief because the social media companies were found "free to enforce, or not to enforce," the policies the government were alleged to have coerced on the social media companies.

---

[1] According to the Plaintiff, the Department presumes that certain types of mental disorders effectively equate to dangerousness. (ECF No. 1, Compl. ⁋ 63.)  The Plaintiff does not identify which mental disorders allegedly are equated with dangerousness.  In fact, the Plaintiff does not provide a single example of such a dangerousness evaluation.

*Id.* at 73.   Similarly, the courts are not required to make findings that IST individuals are dangerous based upon the recommendations of the Department's evaluator.    Plaintiffs do not allege that the IST individuals are unable to present their own assessments and evaluations and present other evidence on the issue of dangerousness, as § 3-106(c)(1)(i) provides, the dangerous determination is made "after a hearing."   Nor is there an allegation that the court cannot reject the recommendations as inadequate or find insufficient evidence of dangerousness.

Additionally, the vast scope of the relief sought by Plaintiff fails the redressability test. "The scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Cornwell v. Sachs*, 99 F. Supp. 2d 695, 714 (E.D. Va. 2000) ("An injunction of any sort must be tailored to fit the facts of the particular case and must be only so broad as to achieve the results permitted by the record.").   Plaintiffs are entitled to seek injunctive relief directly remedying the violations they allege—and no more.   *See Bone v. Univ. of N. Carolina Health Care Sys.*, No. 1:18-CV-994, 2023 WL 4144277, at *27 (M.D.N.C. June 22, 2023) ("The focus of the injunctive relief is therefore limited to remedying the problem Plaintiffs have identified.").   Plaintiff seeks more than to require the Department to admit court committed defendants to its facilities within a time frame consistent with due process.   They seek expansive relief that is inconsistent with the Department's legal obligations and authority under the Criminal Procedure Article, such as dictating the scope of a competency evaluation to include "any accommodations necessary to ensure people with disabilities are afforded an equal opportunity to access and benefit from competency restoration services and pre-trial release," *see* (ECF No. 1, Compl. ⁋ 76.c.), and to "order MDH to immediately reevaluate all pre-trial detainees in detention centers who are awaiting transfer to MDH to assess whether impermissible

stereotyping or deprivation of accommodations contributed to a prior improper dangerousness finding that led to an unlawful commitment to MDH." (ECF No. 1, Compl. ‖ 76.e.)[2]

For these reasons, the Complaint should be dismissed for lack of standing.

II. **THE INDIVIDUALS FOUND INCOMPETENT TO STAND TRIAL HAVE NOT BEEN DENIED SERVICES "BY REASON OF SUCH DISABILITY," AND PLAINTIFF IMPROPERLY IMPUTES ACTIONS OF THE COURT TO THE DEPARTMENT.**

Under the Plaintiff's third cause of action, the Plaintiffs filed suit against the Department under Title II of the ADA, 42 U.S.C. § 12132. To state a claim under Title II of the ADA, a claimant must allege: (1) that there is a qualified individual with a disability; (2) that the disabled individual was excluded from participation in or denied the benefits of the services, program, or activities of a public entity or otherwise discriminated against by such entity; (3) by reason of such disability. *Baird ex rel. Baird v. Rose,* 192 F.3d 462, 467-70 (4th Cir. 1999).

A. **IST Individuals Were Not Denied Services by Reason of Their Disability.**

The Plaintiff's third cause of action concerns only individuals who have been found, at some point, incompetent to stand trial ("IST") and dangerous by a court. IST is defined as "not [being] able (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." The Plaintiff's theory is that the Department violated the ADA, through dangerousness evaluations it conducted, by causing, pursuant to findings of dangerousness, the IST individuals to remain in facilities instead of receiving competency restorative services in the community.

As an initial matter, the Plaintiff alleges that IST individuals have a disability, whether it is a mental illness, mental disorder, or a developmental disorder. According to paragraph 58 of their Complaint, IST individuals are disabled: "IST-adjudicated defendants' mental illnesses or developmental disabilities substantially limit one or more major life activity, including their ability

---

[2] See also Section III. Herein.

8

to live in the community without support." (ECF No. 1, Compl. ¶ 58.)    And, pursuant to § 3-106(c)(c)(i) of the Criminal Procedure Article, an individual found IST and dangerous has a disability, such as a mental disorder or an intellectual disability.  A "mental disorder" is defined as "a behavioral or emotional illness that results from a psychiatric or neurological disorder," "includ[ing] a mental illness that so substantially impairs the mental or emotional functioning of a person as to make care or treatment necessary or advisable for the welfare of the person or for the safety of the person or property of another."  Crim. Proc. § 3-101(g)(1), (2).

The Plaintiff's third cause of action fails to state a recognized claim under the ADA, because the ADA pertains to disabled individuals being denied services that non-disabled individuals receive.  *See Matthew P. by Fedora P v. Neifeld,* 196 N.Y.S.3d 647, 654 (2023) (explaining that discrimination under the ADA is not recognized "where plaintiff requested a substantial benefit that was not provided to non-disabled") (citing *Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir. 1999)).   "[T]he central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive 'even-handed treatment' in relation to the able-bodied."  *Doe v. Pfrommer,* 148 F.3d 73, 83 (2d Cir. 1998).

The community-based competency restorative services that the Plaintiff claims certain IST individuals have been denied are not services that non-disabled individuals receive, and the Plaintiff has not alleged that non-disabled individuals receive competency restorative services. Distilled to its essence, the Plaintiff's theory specifically concerns the portion of IST-adjudicated individuals who have been found dangerous based solely on them having "certain types of mental disorders."  (ECF No. 1, Compl. ¶ 27.) Thus, the discrimination that the Plaintiff alleges is very specific to IST-adjudicated individuals with "certain types of mental disorders," whom, they allege, have not been treated equally with IST-adjudicated individuals with other types of mental

disorders.   Because the discrimination that Plaintiff claim certain disabled individuals have been subjected to is only in relation to other disabled individuals, the Plaintiff's claim does not implicate the ADA.  *See, e.g., Neifeld,* 196 N.Y.S.3d at 654.  The IST-adjudicated individuals, who were allegedly found dangerous solely based upon having a certain type of mental disorder, did not receive disparate treatment as compared to non-disabled individuals.  *See Pfrommer,* 148 F.3d at 83.  The third cause of action should be dismissed.  *See* Rule 12(b)(6).

     **B.**    **The Facts Alleged Do Not Support An ADA Violation.**

    Plaintiff's third cause of action is premised upon Complaint paragraph 27, which vaguely and without any actual factual allegations, asserts that the Department's dangerous evaluations of IST individuals are a product of "discriminatory stereotyping." (ECF No. 1, Compl. ¶ 61.) The Plaintiff's theory is that the Department violated the ADA because the IST individuals are disabled and they were denied community-based competency restorative services as a result of the Department allegedly finding IST individuals dangerous solely based on the IST individual having a certain mental disorder.   Without providing any statements from an actual alleged Department-produced dangerous evaluation, the Plaintiff claims that, when the Department performs dangerous evaluations of IST individuals, the Department "[s]imply presum[es] that certain types of mental disorders effectively equate to dangerousness."  The Plaintiff does not identify the "certain types of mental disorders."   The Plaintiff's factual allegations are inconsistent with their theory of an ADA violation.

    But it must first be noted that the Plaintiff's allegations are inconsistent with the applicable law in Maryland.  The Plaintiff asserts that the Department improperly administers dangerousness evaluations "based solely upon MDH's findings with respect to such defendants' mental illness rather than conducting an appropriate individualized assessment as to whether such defendants'

behavior, in fact, poses a danger to themselves or others."    Notwithstanding the Plaintiff's Complaint, the applicable law, § 3-105(d)(3) of the Criminal Procedure Article, does not provide that the finding of dangerousness is determined by whether the defendant's "*behavior*, in fact, poses a danger to themselves or others."  (ECF No. 1, Compl. ⁋ 61 (emphasis added).)  Instead, it provides that the Department report to the court whether the defendant would be a danger to self or the person or property of another, if released, "because of a *mental disorder* or an intellectual disability."  Crim. Proc. § 3-105(d)(3) (emphasis added.)  Thus, in addition to there not being any actual factual allegations to support the Plaintiff's cause of action, it is not premised on the applicable law.

In any event, the only actual facts alleged that concern the substance of the Department's dangerous evaluations are found in paragraphs 35 and 36, which directly conflict with the Plaintiff's conclusory allegations.  The Plaintiff alleges, in paragraph 35, that J.H., who is diagnosed with autism and bipolar disorder, was arrested for second-degree assault.  According to the Complaint, J.H. was found dangerous not based solely on his mental illness, but on his "history of mental illness *and substance abuse.*" (ECF No. 1, Compl. ⁋ 35 (emphasis added).)  Thus, even under the extremely limited factual allegations pertaining to the dangerous evaluation that the Plaintiff provides, the Department's dangerous recommendation was not based "solely" on the IST individual having a certain mental illness.  Then, after being *released* from an "appropriate state psychiatric facility," after following restoration to competency,  J.H was "homeless," re-taken into custody for failure to appear at a pre-trial conference, and evaluated again.  The dangerous opinion was "identical" to the prior evaluation.

Likewise, the allegations pertaining to T.D., found in paragraph 36 of the Complaint, belie the Plaintiff's conclusory allegations.  According to the Plaintiff, T.D. was diagnosed with bipolar

disorder and schizophrenia, and, on May 6, 2024, charged with burglary and theft-related charges. The Plaintiff alleges that the Department evaluator initially determined that T.D. was IST and dangerous. The Plaintiff does not identify the basis for the Department's opinion that T.D. was dangerous. On May 20, 2024, the Court ordered T.D. committed to the custody of the Department. The State dismissed the burglary charge, and an updated report was issued, in which T.D. was assessed as "IST, but not dangerous," thus indicating that the Department does not find IST individuals dangerous solely on an individual's mental illness.

The Plaintiff discusses the cases of D.L., in paragraph 32 of its Complaint; P.B., in paragraph 33; and M.H., in paragraph 34. Each of these individuals had been adjudicated IST and dangerous. The Plaintiff makes no mention of a dangerousness evaluation for any of these three individuals. The Plaintiff's factual allegations do not support its conclusory allegations of an ADA violation under its third cause of action. Plaintiff's third cause of action should be dismissed for failure to state a claim for which relief can be granted, pursuant to Rule 12(b)(6).

III.  **THE PLAINTIFF'S LAWSUIT DOES NOT IMPLICATE *OLMSTEAD* BECAUSE *OLMSTEAD* DOES NOT PERTAIN TO PLACING DISABLED INDIVIDUALS FROM ONE INSTITUTIONAL SETTING TO ANOTHER INSTITUTIONAL SETTING.**

The Plaintiff's fourth cause of action mistakenly relies upon *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999). The Plaintiff alleges the following in paragraph 67 of its Complaint: "In over-designating criminal defendants as 'dangerous,' and denying access to appropriate supports that could mitigate dangerousness in the community, MDH violates the ADA by forcing those with mental disabilities to relinquish participation in community life . . . ." (ECF No. 1, Compl. ⁋ 67.) For there to be a violation of the ADA pursuant to *Olmstead*, however, "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate." *Olmstead,* 527 U.S.

at 607.   Paragraph 67 indicates that the State treatment professionals did not find the IST-adjudicated individuals appropriate for community-based treatment, thus, *Olmstead* is inapplicable here.

The Plaintiff also incorrectly claims that the failure to move IST individuals adjudicated dangerous from a detention center to a State psychiatric hospital constitutes an ADA violation under *Olmstead.*   The Plaintiff incorrectly contends that *Olmstead* requires the Department to administer its services in the "least restrictive setting."   (ECF No. 1, Compl. ⁋ 67.)   *Olmstead,* however, pertains to the "integration mandate," *see* 28 C.F.R. § 35.130(d), which precludes the unjustified institutional isolation for persons with disabilities.  *See Neifeld,* 196 F.3d at 655 (citing *Davis v. Shah,* 821 F.3d 231, 260 (2016).   Moving an IST individual from a detention center to a State psychiatric hospital is moving an individual from one institutional setting to another.   The "most integrated setting appropriate" is the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  *Olmstead,* 527 U.S. at 592.   An institutional care facility, such as a State psychiatric hospital, is not an integrated setting, as all the individuals who reside there are disabled.  *See Olmstead,* 527 U.S. at 597; *Neifeld,* 196 N.Y.C.3d at 661.   Thus, *Olmstead* does not support the Plaintiff's contention that the failure to move an IST individual from a detention center to a State psychiatric hospital constitutes an ADA violation.

The Plaintiff alleges, in paragraph 66, that "non-dangerous IST-adjudicated defendants are *often* excluded from their communities . . . ."  (ECF No. 1, Compl. ⁋ 66.)   The Plaintiff, however, alleges only a single anecdotal instance of an individual adjudicated IST and non-dangerous who remained in an institutional setting, which is mentioned in paragraph 36 of the Complaint. According to the Complaint, this individual, T.D., was released from the Special Needs Unit of the St. Mary's County Detention Center, on November 7, 2024.   This single instance concerning

an individual, who apparently was released into the community on November 7, 2024, does not entitle the Plaintiff to the relief they seek: injunctive relief.

"To obtain forward-looking relief, the plaintiffs must establish a substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them." *Murthy,* 603 U.S. at 69.  The Plaintiff must show that the conduct upon which the injunction is sought would likely occur or continue.  *Id.*  The single instance of an IST and non-dangerous adjudicated individual remaining in an institution is woefully insufficient for a finding of future injury.  *See id.*  The failure of the Plaintiff to allege conduct beyond a single episode demonstrates an inability to redress the conduct through an injunction, warranting dismissal.  *Id.*

The Plaintiff's fourth cause of action should be dismissed, pursuant to Rule 12(b)(1) and 12(b)(6).

**IV.    THE REHABILITATION ACT CLAIM SHOULD BE DISMISSED UNDER THE ADA ANALYSIS.**

Because the ADA and the Rehabilitation Act are essentially the same, the same analysis applies to both.  *Spencer v. Early,* 278 F. App'x 254, 261 (4th Cir. 2008) (citing *Baird ex rel. Baird v. Rose,* 192 F.3d 462, 468 (4th Cir. 1999)).  "With the exception of its federal funding requirement, the [Rehabilitation Act] uses the same standards as the ADA, and therefore, cases interpreting either are applicable and interchangeable." *Badillo v. Thorpe,* 158 Fed. Appx. 208, 214 (11th Cir. 2005).

The Plaintiff's claims under Section 504 of the Rehabilitation Act, in Plaintiff's fifth cause of action, are the same as mentioned in its third and fourth causes of action under the ADA. Therefore, for the reasons set forth above, which are incorporated by reference into this section, the Plaintiff's fifth cause of action should be dismissed.

**CONCLUSION**

The Plaintiff's Complaint against the Department, alleging violations of Title II of the ADA, and Section 504 of the Rehabilitation Act should be dismissed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Nicole Lugo Clark*
NICOLE LUGO CLARK
Federal Bar No. 26983
Assistant Attorney General
Maryland Department of Health
300 W. Preston Street, Suite 302
Baltimore, Maryland 21201
Nicole.LugoClark@maryland.gov
(410) 767-5292 (direct)
(410) 333-7894 (facsimile)

*/s/ Musa L. Eubanks*
MUSA EUBANKS
Federal Bar No. 15130
Assistant Attorney General
Maryland Department of Health
300 W. Preston Street Suite 302
Baltimore, Maryland 21201
(410) 767-1866 (direct)
(410) 333-7894 (fax)
Musa.eubanks@maryland.gov

Attorneys for the Maryland Department
of Health and Secretary of Health

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 17th day of March, 2025, the Defendants' Memorandum in Support of its Motion to Dismiss was filed through the ECF system and served electronically on counsel for Plaintiffs via the Court's ECF system.

*/s/ Musa L. Eubanks*
Musa L. Eubanks

15