IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**DISABILITY RIGHTS MARYLAND, INC.,**

       *Plaintiff*,

    **v.**                         **Civil No.: 1:25-cv-00070-JRR**

**DR. MEENA SESHAMANI,** *et al.*,

       *Defendants*.

<u>**MEMORANDUM OPINION**</u>

Pending before the court is Defendants' Motion to Dismiss (ECF No. 18; the "Motion to Dismiss") and Plaintiff's Motion for an Entry of an Order of Partial Default (ECF No. 21; the "Default Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, the Motions will be denied.

## I.    <u>BACKGROUND</u>[1]

Plaintiff Disability Rights Maryland, Inc. ("DRM"), brings this action against Dr. Meena Seshamani[2] in her official capacity as Secretary of the Maryland Department of the Health (the "Department" or "MDH") and the Department alleging violations of the Fourteenth Amendment of the U.S. Constitution under 42 U.S.C. § 1983, Article 24 of the Maryland Declaration of Rights, Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act. (ECF No. 1.) It brings this action on behalf of the more than 200 individuals charged with a criminal offense by the State of Maryland who have been found incompetent to stand trial ("IST") and a potential danger to themselves or others based on mental health. *Id.* ¶ 1.

---

[1] For purposes of resolving the Motion, the court accepts as true all well-pled facts set forth in the Complaint. (ECF No. 1.) *See Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

[2] Dr. Meena Seshamani became the Secretary of the Maryland Department of Health on April 9, 2025. Pursuant to Federal Rule of Civil Procedure 25(d), Madam Clerk shall substitute Dr. Meena Seshamani for Dr. Laura Herrera Scott as a Defendant in this action.

### A.  Maryland Statutory Scheme Regarding Competency Determinations

At issue here is the Maryland statutory scheme concerning a criminal defendant's competency to stand trial.  "A criminal prosecution may not proceed against a defendant who is not competent to stand trial."  *Powell v. Maryland Dep't of Health*, 455 Md. 520, 527 (2017).  Under Maryland law, a defendant is IST where he or she is "not able: (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense."  MD. CODE ANN., CRIM. PROC. § 3-101(f).  Section 3-104 of the Criminal Procedure Article of the Maryland Code provides:

> If, before or during a trial, the defendant in a criminal case or a violation of probation proceeding appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

*Id.* § 3-104(a).

As part of this process, the court "may order the [] Department to examine the defendant to determine whether the defendant is incompetent to stand trial."  MD. CODE ANN., CRIM. PROC. § 3-105(a)(1).  Where the court orders such an examination, the Department "shall (i) examine the defendant; and (ii) send a complete report of its findings" to the court, the state's attorney, and the defendant's counsel.  *Id.* § 3-105(d)(1).  Where the Department "reports that, in its opinion, the defendant is incompetent to stand trial," its "report shall state . . . whether, because of a mental disorder or an intellectual disability, the defendant would be a danger to self or the person or property of another, if released."  *Id.* § 3-105(d)(3).

If, following a hearing, the court finds the defendant IST but not dangerous, it "may set bail for the defendant or authorize release of the defendant on recognizance."  MD. CODE ANN., CRIM. PROC. § 3-106(b).  On the other hand, if the court finds the defendant both IST and

dangerous, it "shall order the defendant committed to the facility that the [] Department designates" until the court finds one of the following:

> 1. the defendant no longer is incompetent to stand trial;
> 2. the defendant no longer is, because of a mental disorder or an intellectual disability, a danger to self or the person or property of others; or
> 3. there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

*Id.* § 3-106(c)(1)(i).

Where the court commits a defendant to the Department's custody pursuant to the above finding, the Department shall then "admit the defendant to a designated health care facility as soon as possible, but not later than 10 business days after the [] Department receives the order of commitment," and "notify the court of the date on which the defendant was admitted to the designated health care facility." *Id.* § 3-106(c)(2). The court may then further order the Department to "evaluate the defendant," "develop a prompt plan of treatment for the defendant under § 10-706 of the Health-General Article," and "evaluate whether there is a substantial likelihood that, without immediate treatment, including medication, the defendant will remain a danger to self or the person or property of another." *Id.* § 3-106(c)(3). If the Department does not admit the defendant to a designated health care facility within the 10 business days noted above, "the court may impose any sanction reasonably designed to compel compliance." *Id.* § 3-106(c)(4).

A "designated health care facility" refers to a Maryland facility "owned or operated by the Department," a Maryland forensic residential center, or "a hospital or private residential facility under contract with the [] Department to house and treat individuals found to be incompetent to stand trial or not criminally responsible." MD. CODE ANN., CRIM. PROC. § 3-106(a)(1); MD. CODE

ANN., HEALTH-GEN. § 10-101(k).  It "does not include a correctional or detention facility or a unit within a correctional or detention facility."  MD. CODE ANN., CRIM. PROC. § 3-106(a)(2).

Following commitment, the court "shall hold a hearing" to "determine whether the defendant continues to meet the criteria for commitment" at least every year from the date of commitment.  *Id.* § 3-106(d)(1).  At such a hearing:

> [I]f the court finds that the defendant is incompetent and is not likely to become competent in the foreseeable future, the court shall:
>
> (1) civilly commit the defendant as an inpatient in a medical facility that the Health Department designates provided the court finds by clear and convincing evidence that:
>
>     (i) the defendant has a mental disorder;
>     (ii) inpatient care is necessary for the defendant;
>     (iii) the defendant presents a danger to the life or safety of self or others;
>     (iv) the defendant is unable or unwilling to be voluntarily committed to a medical facility; and
>     (v) there is no less restrictive form of intervention that is consistent with the welfare and safety of the defendant; or
>
> (2) order the confinement of the defendant for 21 days as a resident in a Developmental Disabilities Administration facility for the initiation of admission proceedings under § 7-503 of the Health–General Article provided the court finds that the defendant, because of an intellectual disability, is a danger to self or others.

*Id.* § 3-106(e).

**B.  The Instant Allegations**

This action concerns the alleged failure of the Department to "execute on its obligations to admit defendants into designated health care placement within the required 10-day period following its notification of courts' determinations that those defendants are both IST and dangerous."  (ECF No. 1 ¶ 23.)  DRM alleges that "as many as 225 IST-adjudicated individuals who have been charged with committing crimes in the State of Maryland—but convicted of nothing—have been or are currently being held in jails or other detention facilities for periods of

4

time far exceeding 10 business days from the date on which MDH was notified of their court determinations." *Id.* ¶ 25. While these individuals are held in jails, DRM contends they "endure a functionally indefinite detention." *Id.* ¶ 26. "They have no access to treatment plans or resources that might aid them in seeking to regain competency or become less dangerous, and no means by which to demonstrate such recovery to the courts even if they were receiving treatment rather than just being warehoused," thus "directly contraven[ing] the defendants' substantive due process rights under the Fourteenth Amendment." *Id.*

DRM further asserts that "this 'recurring problem' is exacerbated, upon information and belief, by [the Department's] engagement in the practice of imputing a presumption of dangerousness based solely upon a finding of mental illness, rather than as a result of an individualized mental health assessment." (ECF No. 1 ¶ 27.)

> This practice has caused a gross over-designation of IST defendants as dangerous by the courts, which generally defer to the recommendation of MDH in classifying defendants. Simply presuming that certain types of mental disorders effectively equate to dangerousness without an individualized determination constitutes discriminatory stereotyping and unnecessarily expands the scope and the impact of MDH's failure to comply with its basic legal obligations.

*Id.* As evidence of the impact, DRM points to an opinion of the Circuit Court for Anne Arundel County, Maryland, in which the court relied upon an evaluation from the Department in adjudicating the defendant IST and dangerous, yet that defendant remained at the Anne Arundel County Detention Center for more than 133 days instead of being referred to a State health care facility. *Id.* ¶¶ 29–30.

DRM alleges that "over forty percent (40%) of the individuals who have been adjudicated incompetent to stand trial and are indefinitely detained, were charged with misdemeanor offenses

or non-violent felonies, and these individuals could likely be restored to competency in the community with appropriate supports." (ECF No. 1 ¶ 31.)

In support of its allegations, DRM provides examples of defendants referred to as D.L., P.B., M.H., J.H., and T.D.

D.L. "was arrested on September 13, 2023 during a manic episode," detained at the Jennifer Road Detention Center, and not transferred to the State psychiatric hospital until April 25, 2024. *Id.* ¶ 32.

P.B. was found IST and committed to the Department's custody on June 21, 2024; they[3] were detained in a non-Department facility for 68 days before they were released. *Id.* ¶ 33. Upon subsequent adjudication that P.B. was IST and dangerous, P.B. awaited "admission to a designated psychiatric facility following their commitment to the [Department]," and they were "at the Wicomico County Detention Center for over two months in solitary confinement and on suicide watch, without clothing, a bed, recreation time, or visitors," and without any "counseling, mental health services, or any other competency restoration services." *Id.*

M.H. was arrested in April 2024; they were found IST and dangerous, and thus committed to the Department's custody, on September 19, 2024. (ECF No. 1 ¶ 34.) As of January 9, 2025, M.H. continues to be detained at Baltimore Central Intake and Booking Center, awaiting transfer to a Department facility, and without access to "necessary mental health treatment, group therapy, and regular medications, as well as contact with family and other critical social supports." *Id.*

J.H. was found IST and dangerous by a Department-appointed forensic examiner "based solely on J.H.'s history of mental illness and substance use, despite noting that J.H had no recent history of illegal drug use and no evidence of any dangerous behavior." (ECF No. 1 ¶ 35.) "J.H.

---

[3] The court comports with the pronouns used in the Complaint to refer to the individuals whose examples upon which DRM relies.

was detained in the Harford County Detention Center for 48 days prior to being admitted to an appropriate state psychiatric facility." *Id.* He was discharged six months later, having been found eligible for community-based services. *Id.* But when he failed to appear for a pre-trial conference due to being unhoused (according to DRM), he was again taken into custody and "evaluated by the same [Department] forensic examiner, who again found J.H. IST and dangerous based solely on J.H.'s mental illness, rather than behavior, rendering a dangerousness opinion that was identical to the opinion rendered in J.H.'s prior evaluation." *Id.* He was thus, again, committed to the Department's custody and detained in jail "in jail for another 63 days without treatment before he was admitted to a designated state psychiatric facility on January 30, 2024." *Id.*

T.D. was evaluated by a Department forensic evaluator who found him IST and dangerous. (ECF No. 1 ¶ 36.) The court ordered him into the Department's custody on May 20, 2024. *Id.* Ultimately, he was assessed not dangerous and released with recommended community services. *Id.* "While T.D. sought out, applied for, and was found to be eligible to participate in community-based services and supports, MDH failed to create the plan of services required by Md. Code Ann., Crim. Proc. § 3-108(a)(3) to guarantee T.D.'s access to the necessary wraparound supports that were required to maintain his competency and secure T.D.'s pre-trial release with supervision." *Id.* "As a result, T.D. remained stuck in the detention center for more than five (5) months without access to appropriate mental health care or other competency restoration services." *Id.*

### C. Relevant Procedural History

On January 9, 2025, DRM filed the instant Complaint in which it asserts five counts:

> Count I: Violation of the Fourteenth Amendment of the United
> States Constitution under 42 U.S.C. § 1983 against the Secretary;
>
> Count II: Violation of Article 24 of the Maryland Declaration of
> Rights against the Secretary;

Count III: Violation of Title II of the ADA—Disparate Treatment
Claim against the Secretary;

Count IV: Violation of Title II of the ADA—*Olmstead* Claim
against the Secretary; and

Count V: Violation of Section 504 of the Rehabilitation Act against
Defendants.

(ECF No. 1 ¶¶ 37–75.)  DRM seeks declaratory and injunctive relief, an award of reasonable
attorneys' fees and costs, and other relief the court finds "necessary or appropriate in the interests
of justice." *Id.* ¶¶ 76–78.

On March 17, 2025, Defendants filed the Motion to Dismiss pursuant to Federal Rules of
Civil Procedure 12(b)(1) and 12(b)(6), arguing that DRM lacks standing to pursue the relief it
seeks and that each of Counts III, IV, and V fail to state a claim.   (ECF No. 18.)  On March 31,
2025, DRM filed the Default Motion pursuant to Federal Rule Civil Procedure 55(b)(2) as to
Counts I and II.  (ECF No. 21.)  The court first addresses Defendants' Motion to Dismiss before
turning to DRM's Default Motion.

## II.    LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of
subject matter jurisdiction."  *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016).
Subject matter jurisdiction challenges may proceed as "either a facial challenge, asserting that the
allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a
factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'"
*Mayor & City Council of Balt. v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns
v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).

8

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same). Conversely, in a factual challenge, "the presumption of truthfulness normally accorded a complaint's allegations does not apply, and the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650 (4th Cir. 2018) (same). "In that circumstance, the court 'may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Trump*, 416 F. Supp. 3d at 479 (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)). Defendants here assert a facial challenge to the court's subject matter jurisdiction, averring that DRM lacks standing to seek the relief sought. (ECF No. 19 at pp. 5–8.)

### B. Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Papasan v. Allain*, 478 U.S. 265, 283 (1986)). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that 'the defendant is liable for the misconduct alleged.'" *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citation modified) (quoting *Twombly,* 550 U.S. at 555, 570). "The plausibility requirement imposes not a probability requirement but rather a mandate that a plaintiff 'demonstrate more than a sheer possibility that a defendant has acted unlawfully." *In re Birmingham*, 846 F.3d at 92 (quoting *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009)). Reliance on "labels and conclusions" and "a formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

### A.  Standing

The court turns first to Defendants' argument that DRM lacks standing. The Constitution extends the judicial power of Article III courts to "cases" or "controversies." U.S. CONST. ART. III, § 2, cl. 1. The doctrine of standing, among others, "implements" this limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). "Article III standing is 'part and parcel of the constitutional mandate that the judicial power of the United States extend only to cases and 'controversies.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (quoting *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  As Plaintiff, DRM bears the burden to establish its standing.  *Lujan*, 504 U.S. at 561.

Relevant here, Defendants challenge DRM's Complaint as to the second and third elements of standing—what courts often refer to as causation (or traceability) and redressability.[4]  First, Defendants urge that DRM's allegation that the Department's "practice of imputing a presumption of dangerousness based solely upon a finding of mental illness, rather than as a result of an individualized mental health assessment," does not support causation, because it is the court, not the Department, that adjudicates an individual as IST and dangerous (or not).  (ECF No. 1 ¶¶ 27, 61; ECF No. 19 at p. 6.)  The court's deference to the Department's evaluation is not, according to Defendants, sufficient to establish the causation aspect of standing.  (ECF No. 19 at pp. 6–7.)  Second, Defendants assert that DRM's requested relief "fails the redressability test," because the injunctive relief sought is broader in scope than the violations Plaintiff alleges.  *Id.* at p. 7.

### 1. *Causation/Traceability*

The causation or traceability element "ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court."  *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002)).  While "the injury complained of" cannot be "the result of the *independent* action of some third party not before the court,'" *see Bennett v. Spear*, 520 U.S. 154, 169 (1997) (emphasis in original) (citation modified) (quoting *Lujan*, 504 U.S. at 560–61), this element "does not require the challenged action to be the sole or even immediate cause of the injury."  *Sierra Club v. United States Dep't of the Interior*,

---

[4] Notwithstanding DRM's opposition defending its associational standing and injury in fact, Defendants do not argue DRM lacks standing on these grounds.

899 F.3d 260, 284 (4th Cir. 2018).  Where "multiple actors are involved," a plaintiff establishes causation "if the defendant's conduct had a 'determinative or coercive effect upon the action of someone else.'"  *Sheppheard*, 143 F.4th at 243 (quoting *Bennett*, 520 U.S. at 169).

The court construes Defendants' challenge as to causation, which does not concern their alleged failure to act after a court finds a defendant to be IST and dangerous, as relevant to DRM's ADA and Rehabilitation Act claims.  *Compare* ECF No. 1 ¶¶ 38–55, *with id.* ¶¶ 57–75.  Defendants misconstrue DRM's claims.  DRM's claims are not rooted in the court's adjudication of a defendant as IST and dangerous, but rather the method by which the Department undertakes and performs its statutorily mandated report obligation, which report is then presented to the court to aid and inform its decision-making.  (ECF No. 1 ¶¶ 27, 61–64, 66–67.)  DRM's allegations zero-in on the manner in which the Department undertakes (or fails to discharge) its legal duty in a way that violates, relevant here, the ADA and the Rehabilitation Act.  Beyond this point, DRM further alleges that, in reaching their determination, courts generally rely upon the Department's assessment set forth in its report.  That Defendants may not be "the sole or even immediate cause of the injury" does not mean the injury is not sufficiently traceable to their conduct.  *Sierra Club*, 899 F.3d at 284.  DRM has alleged sufficient facts regarding the Department's conduct, as well as courts' deference thereto (ECF No. 1 ¶¶ 29, 35), to establish that the complained-of injury was likely caused by the Department's challenged conduct.  *Sheppheard*, 143 F.4th at 243, *supra*.[5]

---

[5] Defendants rely heavily upon the Supreme Court's recent opinion in *Murthy v. Missouri*, 603 U.S. 43 (2024).  The *Murthy* Court discussed standing on an appeal of an award of a "sweeping preliminary injunction."  *Id.* at 48.  This case does not come before the court on a motion for preliminary injunction.  In any event, as described above, Defendants oversimplify DRM's claims.  DRM's requested relief is specifically tailored to the actions the Department is obliged to take in the competency process, not the court's ultimate determination.  (ECF No. 1 ¶ 76.)  Judicial deference to and reliance upon Department recommendations, Plaintiff alleges, is a direct (and expected) impact of the Department's complained-of dereliction of duty, which ultimately is borne by individuals left to languish in the purgatory between criminal detention and treatment.

### 2. *Redressability*

The redressability element of standing "ensures that the court has the power to grant the plaintiff's requested relief, and that such relief would remedy the plaintiff's injury." *Sheppheard v. Morrisey*, 143 F.4th 232, 243 (4th Cir. 2025) (citing *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020)). It is well-recognized that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (first citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); then citing *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). "To determine whether an injury is redressable, a court will consider the relationship between 'the judicial relief requested' and the 'injury' suffered." *California v. Texas*, 593 U.S. 659, 671 (2021) (quoting *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). A plaintiff "must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). It "need not show that a favorable decision will relieve [its] every injury," rather that it "personally would benefit in a tangible way from the court's intervention." *Id.* (first quoting *Larson v. Valente*, 456 U.S. 228, 242–44 & n.15 (1982); then quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000)).

DRM seeks declaratory and broad injunctive relief to address the alleged violations in the Complaint, namely, to declare unconstitutional Defendants' practice of indefinitely jailing IST-adjudicated defendants and to order the Department to conduct its evaluations in a manner not violative of the ADA and Rehabilitation Act. (ECF No. 1 ¶ 76.) Defendants do not challenge the

court's authority to declare actions unlawful or to award broad injunctive relief (as a general proposition). *See Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) ("The Judiciary Act of 1789 endowed federal courts with jurisdiction over "all suits . . . in equity," § 11, 1 Stat. 78, and still today, this statute "is what authorizes the federal courts to issue equitable remedies," S. Bray & E. Sherwin, Remedies 442 (4th ed. 2024)."); *cf. State v. Neiswanger Mgmt. Servs., LLC*, 457 Md. 441, 474 (2018) (noting that "[c]ourts can, and do, compel performance of a variety of obligations, including compliance with law") (citing *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 550–51 (1937)). Nor do Defendants dispute that the relief sought would remedy the asserted injury. *See Sheppheard*, 143 F.4th at 243, *supra*. Instead, Defendants urge that the "vast scope of relief sought" does not comport with the redressability element because the relief sought is "inconsistent with the Department's legal obligations and authority." (ECF No. 19 at p. 7.)

The court is not persuaded that DRM lacks standing solely because it may not ultimately prove an entitlement to the broad relief it seeks. As discussed above, by its allegations, DRM has established it seeks relief within this court's authority to dole out—declaratory and injunctive relief—and that would redress the injuries asserted. *See Sheppheard*, 143 F.4th at 243, *supra*. The requested relief is tailored to Defendants' role in the competency evaluation process and the Department's obligations under Maryland law. That DRM may not ultimately prove its entitlement to its broad prayer for relief does not mean the court lacks authority to issue declaratory and injunctive relief as against Defendants tailored to the complained-of acts. The cases upon which Defendants rely—cases regarding the scope of injunctive relief and not standing—illustrate precisely this point. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 696 (E.D. Va. 2000). Defendants may challenge, even cast doubt upon,

DRM's entitlement to the vast relief it seeks, but such arguments are properly addressed on their merits, not as a jurisdictional challenge.[6]

In view of the foregoing, the court will deny the Motion to Dismiss pursuant to Rule 12(b)(1) for lack of standing.

### B.  The ADA and Rehabilitation Act

Defendants' remaining arguments challenge DRM's claims under the ADA and the Rehabilitation Act.[7]

"Title II of the ADA and Section 504 of the Rehabilitation Act prohibit discrimination against an individual because of his or her disability." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).  Pursuant to Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[8]  42 U.S.C. § 12132.  The Rehabilitation Act provides that no "qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

"Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same."  *Wicomico Nursing Home*, 910 F.3d at 750 (quoting *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir.

---

[6] Moreover, even considering Defendants' challenge to the breadth of the requested relief, Defendants rely upon conclusory assertions that the requested relief is inconsistent with the Department's legal obligations and authority to permit reasonable accommodations and to conduct re-evaluations of those currently detained pursuant to a discriminatory screening practice.  *Cf. Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018) (noting that a defendant's hypothesis of "possible future harm" caused by the requested relief is not sufficient "to overcome the fact that a favorable ruling would redress" the injury at issue).

[7] The court cabins its analysis to the arguments asserted by Defendants in their Motion to Dismiss.

[8] Defendants do not dispute that they are required to comply with the requirements of Title II and the Rehabilitation Act.  (ECF No. 1 ¶¶ 5–6.)

2012)).  "To establish a violation of either statute, plaintiffs must prove '(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability.'" *Id.* (quoting *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016)).  The ADA and Rehabilitation Act "differ only with respect to the third element, causation,"—the ADA requires "only that the disability was a motivating cause" of the exclusion, and the Rehabilitation Act requires a plaintiff show exclusion "solely by reason of his disability."  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012).

"Congress instructed the Attorney General to issue regulations implementing provisions of Title II, including § 12132's discrimination proscription."  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 591 (1999).  Two such regulations are at issue here.[9]  The "methods of administration regulation" provides that a public entity "may not . . . utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(3)(i).  The integration regulation provides further that a public entity "shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d); *see* 34 C.F.R. § 104.4(b)(2) (containing a similar integration requirement); *see also Olmstead*, 527 U.S. at 591. (discussing same).  This refers to "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 200 (4th Cir. 2024) (quoting 28 C.F.R. § 35.130, pt. 35, App. B).

---

[9] "To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements."  *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).

The Supreme Court opined on the ADA's integration regulation in *Olmstead v. L.C. ex rel. Zimring*, explaining that "unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II."  527 U.S. 581, 596 (1999).  In *Olmstead*, two women with qualified disabilities brought suit against the state, challenging their confinement in psychiatric institutions.  *Id.* at 594.  Both women remained institutionalized after institution treatment professionals determined their needs could have been appropriately met in community-based programming.  *Id.*  The women argued that "unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II."[10]  *Id.*  In affirming in part the Eleventh Circuit's decision, the *Olmstead* Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability."  *Id.* at 597.

> [U]nder Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.

### 1. *Counts III & V: Violations of the ADA and Rehabilitation Act*

Defendants first seek dismissal of DRM's ADA claim (Count III) (and related Rehabilitation Act claim, Count V), arguing (1) DRM fails to state a claim because non-disabled individuals do not receive community restorative services; and (2) DRM fails to allege facts in support of its claim.  (ECF No. 19 at pp. 8–12.)  The court addresses each in turn.

---

[10] Like the case at bar, the *Olmstead* plaintiffs' complaint also invoked 42 U.S.C. § 1983.  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 593 (1999).

a.  Lack of Comparison

Defendants first argue that DRM fails to state a claim as to Count III under the ADA (and the Rehabilitation Act) because the services at issue are not services that non-disabled individuals receive.  (ECF No. 19 at pp. 9–10, 14.)  According to Defendants, because DRM's claim of discrimination "is only in relation to other disabled individuals," its claim fails.  *Id.*

The court appreciates Defendants' arguments but is not persuaded at this stage that DRM's claim fails as a matter of law on this point.  As DRM notes, the *Olmstead* Court recognized a "comprehensive view of the concept of discrimination advanced in the ADA," and rejected objection by the state that the plaintiffs could not have been subjected to discrimination because they failed to identify a comparison class, "*i.e.,* no similarly situated individuals given preferential treatment."  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–98 (1999) (footnotes and record citations omitted).

Other courts have opined on this aspect of *Olmstead*; the Second Circuit has noted that the *Olmstead* Court rejected argument that "'discrimination necessarily requires uneven treatment of similarly situated individuals,'" meaning a "'comparison class' of similarly-situated non-disabled individuals 'given preferential treatment.'"  *Davis v. Shah*, 821 F.3d 231, 261 (2d Cir. 2016) (citations and footnote omitted); *see also Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 290 (E.D.N.Y. 2008) (recognizing "unnecessary segregation of individuals with mental illness is discrimination *per se* and a violation of the ADA; no demonstration of differential treatment between individuals with mental illness and those without is required").  While not on all fours, as Defendants note, *Olmstead*, and caselaw following it, nonetheless support a comprehensive view of the ADA that, at a minimum, casts doubt on argument that a plaintiff must identify a comparison class to pursue an ADA claim.

The court is presently satisfied that DRM's claim does not fail as a matter of law solely because it concerns the provision of services for which non-disabled individuals are not eligible.[11] Turning to the pleading requirements, DRM alleges each element of the claim at issue: that "IST-adjudicated defendants who have been and/or currently are subject to detention in jail while committed to the custody of MDH and awaiting admission to a designated health care facility for treatment are 'qualified individual[s] with a disability'"; that the competency restoration services at issue "are a program, service, or activity operated by a state or municipal government"; and that the Department engages in discriminatory stereotyping that "subjects a disproportionate number of criminal defendants with mental illness to indefinite pre-trial detention in jails, when many such defendants could instead attain pre-trial release with the provision of appropriate disability-related supports and services in the community." (ECF No. 1 ¶¶ 58–59, 61–62.) *See Wicomico Nursing Home*, 910 F.3d at 750, *supra*.

The court will therefore deny the Motion to Dismiss to the extent is seeks dismissal of Counts III and V on this basis.[12]

b. Pleading Deficiencies

Defendants similarly argue that DRM fails to allege facts to support the purported violation of the ADA and Rehabilitation Act. In particular, Defendants challenge the third element—that IST-adjudicated defendants are discriminated against on the basis of their disability—because DRM's allegation of discriminatory stereotyping is insufficient and its anecdotal examples do not

---

[11] As DRM notes, Defendants' reliance on a New York state court case is not persuasive here because, there, the denial of care and treatment was not based on the plaintiff's disability. *Matthew P. by Fedora P. v. Neifeld*, 80 Misc. 3d 950, 970 (N.Y. Sup. Ct. 2023). The allegations here are materially distinguishable.

[12] Even absent the foregoing, Defendants still fail to meet their burden because they do not even attempt to address DRM's argument raised in opposition—that IST-adjudicated defendants, in contrast to their non-disabled counterparts, are denied participation in pre-trial release by virtue of the Department's discriminatory stereotyping practice. (ECF No. 22 at pp. 18–19.)

adequately support the claim.  Simply put, Defendants urge that DRM has failed to plead sufficient

facts.  The court disagrees.

DRM alleges:

> 27. The magnitude of this "recurring problem" is exacerbated, upon information and belief, by MDH's engagement in the practice of imputing a presumption of dangerousness based solely upon a finding of mental illness, rather than as a result of an individualized mental health assessment. This practice has caused a gross over-designation of IST defendants as dangerous by the courts, which generally defer to the recommendation of MDH in classifying defendants. Simply presuming that certain types of mental disorders effectively equate to dangerousness without an individualized determination constitutes discriminatory stereotyping and unnecessarily expands the scope and the impact of MDH's failure to comply with its basic legal obligations.

> .        .        .

> 35. IST-adjudicated defendant J.H. is a 48-year-old who works at a local grocery store and is diagnosed with autism spectrum disorder and bipolar disorder. In May 2022, J.H. was arrested and charged with a misdemeanor for second-degree assault when he resisted being taken to a hospital for an emergency psychiatric evaluation. At the hospital, J.H. had an involuntary commitment hearing, but was found to not meet the criteria for involuntary civil commitment because any risk of dangerousness could be mitigated in a less restrictive environment and J.H. was subsequently released from the hospital on May 29, 2022. Nonetheless, on June 24, 2022, J.H. was found IST and dangerous by an MDH-appointed forensic examiner based solely on J.H.'s history of mental illness and substance use, despite noting that J.H had no recent history of illegal drug use and no evidence of any dangerous behavior. J.H. was detained in the Harford County Detention Center for 48 days prior to being admitted to an appropriate state psychiatric facility. J.H. was discharged six (6) months later and was found eligible for community-based services after having been restored to competency and showing "no evidence of dangerousness." J.H. then failed to appear for a pre-trial conference scheduled on August 8, 2023, due to J.H. being homeless at the time, causing J.H., to again be taken into custody, and another competency evaluation was ordered. J.H. was evaluated by the same MDH forensic examiner, who again found J.H. IST and dangerous based solely on J.H.'s mental illness, rather than behavior, rendering a dangerousness opinion that was

identical to the opinion rendered in J.H.'s prior evaluation. As a result, J.H. was committed to MDH's custody on November 28, 2023. J.H. languished in jail for another 63 days without treatment before he was admitted to a designated state psychiatric facility on January 30, 2024. As a result of J.H.'s indefinite detentions and denial of community-based competency restoration and maintenance services, J.H. has experienced worsening mental health, homelessness, and an unnecessary delay in adjudicating his charges.

.        .        .

61. As alleged above – *see supra* ¶ 27 – MDH, upon information and belief, has engaged and continues to engage in unlawful discrimination barred by the ADA by imputing a stereotypical determination of dangerousness to certain criminal defendants ordered to receive an MDH-administered mental competency evaluation based solely upon MDH's findings with respect to such defendants' mental illness rather than conducting an appropriate individualized assessment as to whether such defendants' behavior, in fact, poses a danger to themselves or others.

(ECF No. 1 ¶¶ 27, 35, 61.)

DRM's allegations, while perhaps not meaty, are a far cry from conclusory assertions or legal conclusions; nor are anemic such that they fail to provide "a short and plain statement of the claim." FED. R. CIV. P. 8(a)(2). The Complaint alleges specific facts to describe and support DRM's charge that the Department has a practice of "discriminatory stereotyping" by "imputing a presumption of dangerousness based solely upon a finding of mental illness, rather than as a result of an individualized mental health assessment," that this practice has resulted in "a gross over-designation of IST defendants as dangerous by the courts, which generally defer to the recommendation of MDH in classifying defendants," and cites J.H. as an example of that practice. [13] The court is satisfied these factual allegations are sufficient to support DRM's statement of a claim.

---

[13] Defendants make much of DRM's allegation as to J.H.'s history of substance use, but the court declines to address this point. (ECF No. 19 at p. 11.) As discussed above, DRM's allegations are sufficient to state a plausible claim.

Further, Defendants' argument that DRM's allegations "are inconsistent with the applicable law in Maryland" mistakes the point. (ECF No. 19 at pp. 10–11.) DRM alleges that the Department makes dangerousness determinations on improper disability stereotyping. As DRM notes in opposition, Defendants' position that it need not consider separately whether an individual is dangerous is contrary to a plain reading of their statutory obligations, which include that the Department opine separately as to dangerousness for any defendant assessed IST. *See* MD. CODE ANN., CRIM. PROC. § 3-105(d)(3). Regardless, DRM's allegations on this point need not be "detailed," and, in any event, are hardly "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants' asserted challenge as to DRM's view of their statutory obligations is the stuff of litigation; this is not a pleading deficiency.

The court will similarly deny Defendants' Motion to Dismiss on this basis.

### 2. *Counts IV and V: Violations of the ADA and Rehabilitation Act under* **Olmstead**

Defendants further seek dismissal of DRM's "*Olmstead* claim" at Count IV. (ECF No. 19 at pp. 12–15.) DRM roots its *Olmstead* claim in two discrete theories that flow from the integration and methods of administration regulations discussed above. (ECF No. 22 at p. 23.) First, DRM asserts that, where the State's treatment professionals determine community-based placement is appropriate, and IST-adjudicated defendants do not oppose transfer, the IST-adjudicated defendants "are often excluded from their communities and instead, indefinitely detained in jails as a direct result of [the Department's] failure to furnish non-dangerous IST defendants with necessary services and supports." (ECF No. 1 ¶ 66.) Second, DRM alleges that "[t]he indefinite

---

Defendants' argument requires the court to parse out DRM's allegations in a microscopic way that the court is not called upon, and declines, to do on a motion to dismiss. The court need not decide at this stage whether the alleged history of substance use is a disability protected under the ADA, or, similarly, whether the Department's consideration of J.H.'s mental illness as well as his substance use takes this example outside of the complained-of practice.

jailing of IST-adjudicated defendants—simply by reason of their disability—violates [the Secretary's] obligation to administer services, programs, and activities in the most integrated, least restrictive setting appropriate to the needs of qualified individuals with disabilities." (ECF No. 1 ¶ 67.) Specifically, "[i]n overdesignating criminal defendants as 'dangerous,' and denying access to appropriate supports that could mitigate dangerousness in the community," the Department violates the ADA "by forcing those with mental disabilities to relinquish participation in community life they could enjoy, given reasonable accommodations, while persons without mental disabilities may achieve access to an integrated community setting pre-trial without a similar sacrifice." *Id.*

With regard to the first theory, Defendants aver that DRM's allegations are insufficient to support the claim. Again, Defendants rely upon a heightened pleading standard inapplicable here, as belied by their near exclusive reliance on *Murthy v. Missouri,* a case that addressed a motion for preliminary injunction and standing, not whether the plaintiff stated a short and plain statement of its claim. (ECF No. 19 at pp. 13–14, quoting *Murthy v. Missouri*, 603 U.S. 43, 50 (2024).)

DRM alleges that IST-adjudicated defendants are often not placed in community programs, even where Department treatment professionals "have determined that placement in a community program is appropriate," the "IST-adjudicated individuals do not oppose transfer from detention centers to community settings," and community placement can be accommodated. (ECF No. 1 ¶ 66.) The experience of T.D. illustrates, in part, these allegations:

> IST-adjudicated defendant T.D. is a 42-year-old father of two who is diagnosed with bipolar disorder and schizophrenia. On May 6, 2024, T.D. was charged with burglary and theft-related offenses. An MDH forensic evaluator determined that T.D. was IST and dangerous, and the Court ordered him committed to the custody of MDH on May 20, 2024. The same day, the State dismissed T.D.'s felony charge. MDH's forensic examiner then issued an updated report, assessing T.D. as IST, but not dangerous, and recommended

community services with supervision upon release. On June 18, 2024, the Court issued a second order releasing T.D. from MDH commitment and authorized T.D. for pre-trial release with community supervision. While T.D. sought out, applied for, and was found to be eligible to participate in community-based services and supports, MDH failed to create the plan of services required by Md. Code Ann., Crim. Proc. § 3-108(a)(3) to guarantee T.D.'s access to the necessary wraparound supports that were required to maintain his competency and secure T.D.'s pre-trial release with supervision. As a result, T.D. remained stuck in the detention center for more than five (5) months without access to appropriate mental health care or other competency restoration services. His charges timed out on November 7, 2024, and he was released from detention. While detained in the Special Needs Unit at the St. Mary's County Detention Center, T.D. experienced worsening mental health, never had the opportunity to regain competency, and was detained for the maximum sentence on the charged offense, despite never being tried for or convicted of a crime.

(ECF No. 1 ¶ 36.)

While the allegations may not be extensive, DRM's allegations are neither mere legal conclusion nor threadbare recitation of the elements. The Complaint sets forth specific factual assertions to support the claim. Further, these allegations plainly support an *Olmstead* claim— "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated . . . ." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999).

With regard to the second theory, Defendants urge that DRM's claim is not a proper *Olmstead* claim because it does not allege that State treatment professionals found the IST-adjudicated defendants were appropriate for community-based treatment.[14] (ECF No. 19 at pp. 12–13.)    As discussed above, broadly speaking, *Olmstead* provides that "[u]njustified

---

[14] Of course, DRM alleges there is a sub-category for whom State treatment professionals did find community-based treatment appropriate, which the court addressed previously.  As far as the court can discern, the second theory refers more broadly to those for whom State treatment professionals did not recommend community-based treatment.

isolation . . . is properly regarded as discrimination based on disability." 527 U.S. at 597. In particular, "States are required to provide community-based treatment for persons with mental disabilities" where "the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated . . . ." *Id.* at 607. DRM invokes this theory but does not allege (at least as part of this discrete theory) that any treatment professional (State or otherwise) determined community-based treatment was appropriate for the IST-adjudicated defendants at issue.

To be sure, DRM's theory relies on a broad reading of *Olmstead*'s holding; however, it is not entirely without support. A number of district courts have allowed claims to move forward under *Olmstead* absent allegation that a treatment professional determined the individual was eligible for treatment in the less restrictive setting. *See, e.g.*, *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1319 (W.D. Wash. 2015) (holding sufficient to state a claim a plaintiff's allegation that he was eligible for the at-issue "evaluation, specialized services, and alternative community placement, but ha[d] been inhibited from accessing such services because Defendants have failed to conduct the required evaluation that would make such alternative community-based placement options and services available to him"); *Day v. D.C.*, 894 F. Supp. 2d 1, 23 (D.D.C. 2012) (recognizing that, "although the Court in *Olmstead* noted that a State generally may rely on the reasonable assessments of its own professionals, . . . it did not hold that such a determination was required to state a claim" and "[s]ince *Olmstead*, lower courts have universally rejected the absolutist interpretation proposed by defendants") (citing cases); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 292 (E.D.N.Y. 2008) (holding that allegation that individuals "are eligible to receive treatment in more integrated community settings" was "sufficient to suggest that there has been a

professional determination that the clinical needs of these individuals may be met in an integrated, community-based setting").[15]

DRM here alleges that many of the IST-adjudicated defendants "could likely be restored to competency in the community with appropriate supports," but that these individuals are instead unjustifiably confined to detention without services based upon the Department's methods of administration—including discriminatory stereotyping that results in findings of dangerousness where an individual could qualify for community-based treatment. At their core, DRM's allegations concern the "[u]njustified isolation" at issue in *Olmstead* that results from the Department's alleged unlawful stereotyping. *See* 527 U.S. at 597, *supra*. The court acknowledges this presents a close call but is satisfied that DRM has stated a claim under the second theory. To conclude otherwise at the present stage would risk frustrating the ADA's (and Rehabilitation Act's) purpose by allowing the State to avoid the full implication of *Olmstead* by denying meaningful evaluation.[16]

In view of the foregoing, the court will deny Defendants' Motion to Dismiss in its entirety.

## IV.   **THE DEFAULT MOTION**

As discussed above, following Defendants' Motion to Dismiss, DRM moved for partial default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 108.2(b),

---

[15] *Cf. State of Connecticut Off. of Prot. & Advoc. for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 276 (D. Conn. 2010) (describing plaintiff's theory under *Olmstead* to request defendants "cease using methods of administration that subject individuals with disabilities to discrimination and, instead, administer their programs and services in a manner that leads to the most integrated setting appropriate for each putative class member's needs"); *Long v. Benson*, No. 4:08CV26-RH/WCS, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008) ("If, as the plaintiffs assert, the ADA gives a disabled individual for whom a state provides Medicaid assistance in an institution the right to receive assistance for appropriate care in the community, then the Secretary cannot deny the right simply by refusing to acknowledge that the individual could receive appropriate care in the community. Otherwise the right would, or at least could, become wholly illusory.").

[16] Because the court therefore does not reach DRM's argument that it may also pursue its *Olmstead* claim because Defendants have failed to place the IST-adjudicated defendants in the least restrictive environment within the segregated environment. The court notes that this assertion is not particularly persuasive where DRM relies on a single case to support its position, which is fairly distinguishable from the case at bar. (ECF No. 22 at pp. 25–26.)

seeking default judgment as to Counts I and II.[17]  (ECF No. 21.)  According to DRM, Defendants'
Motion to Dismiss "fails entirely to address the First and Second Causes of Action stated in []
DRM's Complaint," relating to violations of 42 U.S.C. § 1983 and Article 24 of the Maryland
Declaration of Rights.  (ECF No. 21-1 at p. 2.)  Defendants oppose the Motion on both procedural
and substantive grounds, arguing that DRM failed to comply with the requisite two-step process
before seeking default judgment and that their challenges to standing sought dismissal of all of
DRM's claims.  (ECF No. 25-1 at pp. 2–3.)

Rule 55(b)(2) allows a party to move the court for entry of default judgment.  FED. R. CIV.
P. 55(b)(2).  Similarly, Local Rule 108.2(b) provides for default judgment where the plaintiff files
a written request with the court.  Local Rule 108.2(b) (D. Md. 2025).  Contrary to DRM's
assertions, it is well-recognized that "Rule 55 contemplates a two-step procedure."  *Fidrych v.
Marriott Int'l, Inc.*, 952 F.3d 124, 130 (4th Cir. 2020).  This includes "the clerk's entry of default
followed by the entry of default judgment."  *Merchants Bonding Co. v. Certified Maint. Co., Inc.*,
No. CV PX 17-0365, 2017 WL 2403567, at *1 (D. Md. June 2, 2017); *see* 10A C. Wright & A.
Miller, FEDERAL PRACTICE & PROCEDURE § 2682 (4th ed.) ("Prior to obtaining a default judgment
under either Rule 55(b)(1) or Rule 55(b)(2), there must be an entry of default as provided by Rule
55(a).").

Defendants are correct that courts in this circuit routinely recognize this two-step process.
*See, e.g.*, *Moore v. Scott*, No. CV 25-1272-BAH, 2025 WL 3039260, at *8 (D. Md. Oct. 31, 2025)
(discussing the two-step process); *Cook v. Superior Assisted Living, LLC*, No. CV EA-24-815,
2025 WL 2897342, at *2 (D. Md. Oct. 10, 2025) (same); *Legacy Inv. & Mgmt., LLC v.
Susquehanna Bank*, No. CIV. WDQ-12-2877, 2013 WL 6990367, at *2 (D. Md. Oct. 2, 2013), *on*

---

[17] The court notes DRM's Notice of Supplemental Authority (ECF No. 30) in which it offers additional legal argument as to its Counts I and II.

*reconsideration,* 2014 WL 823555 (D. Md. Feb. 28, 2014) (same); *Shelton v. Marshall*, 724 F.

Supp. 3d 532, 540 (W.D. Va. 2024) (same); *Das v. NC*, No. 322CV00561FDWDCK, 2023 WL

5088974, at *1 (W.D.N.C. July 18, 2023) (same); *Coles v. Land's Towing & Recovery, Inc.*, No.

3:10-CV-00025, 2010 WL 5300892, at *2 (E.D. Va. Dec. 22, 2010) (same).

Notwithstanding the foregoing, DRM asks this court to order default judgment where no

default pursuant to Rule 55(a) has been sought.  On a similar question, the Honorable Ellen L.

Hollander of this court aptly reasoned:

> In my view, it would be inappropriate to grant plaintiffs' Motion,
> for several reasons. The first problem is procedural, in that the
> Motion does not clearly comply with the two-step process
> established by Fed.R.Civ.P. 55. In particular, plaintiffs' Motion
> appears to request that this *Court* enter default as to AFT, before
> plaintiffs sought and obtained a *clerk's* entry of default. *See Romero
> v. Barnett,* 2011 WL 1938147, at *2 (D.Md. May 20, 2011) ("'[A]
> fatal flaw with the defendants' approach is their blindness to the
> two-step process calling for the entry of default, followed by the
> entry of default judgment.' . . . The defendants failed to implement
> the first step by asking the Clerk of the Court to enter default against
> the plaintiffs.") (citation omitted); 10A Charles Alan Wright &
> Arthur R. Miller, Federal Practice & Procedure § 2682 (3d ed. 2004)
> ("Prior to obtaining a default judgment under either Rule 55(b)(1)
> or Rule 55(b)(2), there must be an entry of default as provided by
> Rule 55(a).").

*Wilson v. Turner*, No. CIV.A. ELH-13-3497, 2014 WL 4426126, at *1 (D. Md. Sept. 2, 2014).

Indeed, DRM seemingly neglects the requisite procedure in its desire for "a quick victory,"

resulting in unnecessary expenditure of time and expense upon both the parties and the court.[18]

*Cf. Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir.

1988) (discussing prejudice on a motion to set aside default judgment).  This is especially profound

---

[18] DRM cites to a previous decision of this court noting that "it is well-established that a default also may be entered by the court." *Mut. of Am. Life Ins. Co. v. Smith*, No. CV DKC 16-1125, 2018 WL 3209376, at *2 (D. Md. June 29, 2018).  The party seeking entry of default there moved pursuant to Rule 55(a), which is to say for entry of default—part one of the two-part process, not, as DRM seeks here, default judgment pursuant to Rule 55(b).

in view of the Fourth Circuit's consistent and "strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits." *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010).

Even absent the procedural issues, the court agrees with Defendants that DRM's Default Motion rests on an incorrect substantive premise. Defendants challenge DRM's standing to pursue this action, specifically as to elements of causation and redressability. While Defendants' causation challenge may fairly be applicable only to the asserted ADA and Rehabilitation Act claims, their argument as to redressability challenges DRM's standing to pursue the claims asserted based on the broad relief sought. Additionally, Defendants labeled their Motion as a "Motion to Dismiss," asking this court "to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1)[] and 12(b)(6)."[19] (ECF No. 18.) The court is satisfied that, by their Motion to Dismiss, Defendants sought to defend this action as to all claims against them. *See* FED. R. CIV. P. 55(a).

In view of the foregoing, the court will deny DRM's Default Motion.[20]

## V.    **CONCLUSION**

For the reasons set forth herein, by separate order, Defendants' Motion to Dismiss and DRM's Default Motion will both be denied.

November 24, 2025                                    /S/

_____

Julie R. Rubin
United States District Judge

---

[19] The court notes DRM's argument that Defendants reference Counts III, IV, and V in their proposed order. (ECF No. 20.) While the court appreciates DRM's point, this is not persuasive when considering the Motion to Dismiss itself.

[20] Apparently recognizing the procedural irregularity, DRM argues for the first time in reply that the court should alternatively enter default pursuant to Rule 55(a). For the reasons set forth herein, the court also denies that request.